Call the next case please. Case number 082776, Martha Rosen v. Phoenix Insurance Company. Please step up, identify yourselves for the record. Good morning, your honors. I'm Alvin Becker. I appear here on behalf of Martha Rosen, the Appellant. Good morning, Michael Riesis, R-E-S-I-S, from Smith Amundsen, on behalf of the Apelli Travelers Insurance Phoenix Insurance Company. All right, gentlemen. I definitely know the name of my client. If it pleases the court, I'm sure sometime in the last 10 or 15 years the insurance executive who thought up this safety valve kick-out clause has been both knighted and inducted into the insurance company hall of fame. Because what they have provided for, for them to escape substantial arbitration awards, is the reason that so many of the courts of our sister states and four of our appellate districts have said that this clause is offensive to public policy in the state of Illinois. Now, counting is not the answer to the question, and I could not look anybody in the eye and say that. Ten justices of our appellate court have said that the clause is vulnerable, unenforceable, and is not effective. Most of them not from Cook County. I'm sorry, sir. I said most of them, but five from Cook County disagree with you. That is absolutely correct if you count by the numbers. So that we now have, so if this occurrence that took place in 2001 and which was supposed to be brought to a speedy conclusion, which resulted in an arbitration award signed off by all three arbitrators in 2008 of $382,500, if that would have occurred in Waukegan or Wheaton, surely the answer cannot be that the situs of the accident determines the validity of the clause, nor do we suggest that that's the answer. It is also true that at no instance has an insurance company in this state been successful with respect to that clause. Although it would be disingenuous, and I do not make the argument, that the validity of the clause was sustained by every court in this state who has touched upon the question. The last case, Zappia, was a complaint filed by the insurer. There's one more reason. I'm sorry, sir. There's a more recent case that's in the paper today, sympathetic to your position. Well, I'm definitely in need of sympathy, your honor, and thank you for bringing it to my attention, but I don't think that sympathy here carries the day. I think it is important to put this into context, and the context I think is definitely magnified and illustrated by a proceeding and decision by the Illinois Supreme Court in a closely related matter, and that, of course, is Reed. Your honors will know that in Reed, the next section below, the uninsured motorist section, has a provision, one, since the middle 1970s, which has assigned arbitration as the exclusive forum for deciding uninsured motorist disputes. After it became that, the legislature saw fit to put in the then $20,000, $40,000 kick-out clause. That's what came before the Illinois Supreme Court in Reed, where the third appellate district, as your honors will recall, said that that violated public policy. The Illinois Supreme Court in a four-to-three decision, and I think most lawyers would say, and I hope most judges would agree, that the public policy is first set by the General Assembly, and it can't be against public policy. However, there was three judges who dissented, not on the public policy ground. They thought the whole business was unconstitutional because it was not reasonably related to a legitimate government purpose. Recalling this being economic regulation, the threshold that the state must show to sustain its validity is very minimal, and it's a rational basis test. Now, after Reed was decided, the third district also decided, Parker, and they held the clause unenforceable in the underinsured motorist context, just as we have here. The Supreme Court, on a leaf to appeal, denied leaf to appeal, but they entered a supervisory order, and the supervisory order says reconsider your ruling based upon Reed. They reconsidered, formed a decision, one judge dissenting, and they affirmed. And a basis for their affirmance, based upon what the Supreme Court had done in Reed, was the Supreme Court was very careful in leaving Bougalawkas, I hope I'm saying that correctly, in leaving Bougalawkas intact, and they were very careful about saying that in Bougalawkas, we do not have a statutory provision. But in Reed, under the uninsured motorist context, we have specific statutory provision. That is the dispositive as to why Bougalawkas and its result has no implication here. Judges who are on the business of drawing and writing opinions, dissenting, concurring opinions, and maybe lawyers who do appellate work sometimes read tea leaves. Every one of these cases drew a PLA. Every one of the cases, the PLA was denied. So after the appellate court third district on remand in Parker 2 decided the case, there was a PLA, and that PLA was denied. The next thing that happens, as we all know, is that another district, excuse me, another panel of this division was called upon to decide that very same question in Salmon, Justice Hoffman dissenting. The concurring opinion of Justice Wolfson, which I don't want to read here, is really an endorsement as to why the Supreme Court impliedly agreed that Bougalawkas was correctly decided. Your honors will also note, because we tried to tell you that in our opening brief here, there is a substantial body of case law that when a reviewing court construes a statute, and it results in a construction which the legislative branch of government would find untoward or not what was intended, then they take no action. It is presumed that the legislative branch is not unhappy with that result and endorses the result. There have been two amendments to the underinsured mortgage statute in the 10 years between Bougalawkas and the last decision in 2006. There has been no legislative reaction to that, to the decision in validating the clause. There has been no legislative reaction to, one, requiring that these disputes be settled by arbitration, and two, having the kick-out clause. Your honors will also note, although not directly relevant to this case, but definitely informative, that since sometime in 2007 or maybe 2006, the provision in 143A, the uninsured mortgage statute, which had a 20-40,000 legislative authorized kick-out, has now been changed to 50,000, 100,000. Perhaps a recognition about the unfairness of the ability of an insurance company to use that, so we're now entering almost the second decade after this accident, and the resolution is still nowhere in sight. And I don't describe any ill motives to the insurance company in that regard. It's the nature of the beast that was created by this clause. If you wander a little bit outside of Illinois, you notice the cases that we have cited. I would like to reference very briefly a decision of the Supreme Court of Delaware in validating the clause there. I cite that only because the Delaware court is specific in suggesting that the two jurisdictions that did not invalidate the clause, Florida and New Jersey, did not invalidate it based upon a rationale comparable to the Illinois Supreme Court decision in Reed. Indeed, the Florida statute says arbitration is binding unless your contract says it's not binding. That's literally what Section 143A says. The arguments made as to why the last decision, ZAPIA, should govern is that, one, this is not a contract of adhesion, and, in fact, that is a specific holding in ZAPIA that these clauses are not contracts of adhesion. Frankly, courts and judges should not be more naive than the average person on the street. So the only choice that an insured has is how much coverage to buy. Recall, Your Honors, that underinsured motorist is not available unless, by statute, is not available unless you have uninsured motorist greater than 20, 40, because that's the way the statute is written. So if you bought a minimum basic limits policy, we wouldn't have excess uninsured and we wouldn't have underinsured. So that's the only choice you get. So if I have 300,000 over 500,000, I'm entitled to have uninsured motorist at that level. I'm entitled to have underinsured at that level. You're speaking of 143, 4 and 5? 143A-2. A-4 and 5. Yes, that's correct. Now, you're arguing just the opposite under that provision. You're saying with that provision, that pulls the men and they should be the same. No. What I'm saying is... No, no, I'm saying what they're saying. Oh, yes. There is the choice and the only choice given to an applicant or an insured. That is, how much coverage can I buy? I don't mean to be disrespectful to the court, but consider you want to buy 250,000, 500,000. You're not going to tell the insurance company, whoever their sales personnel is, and my lawyer will send you a draft of the policy. It clearly is a contract of adhesion. All you need to do is look at the reported decisions to see the names of the insurance companies to know that every insurance company has such a provision. And frankly, an insurance company that didn't have that provision, the underwriter ought to be drawn and quartered for not putting it in there. You know, something that neither side here has done, is they haven't given us statistics over the last year or two showing the outcome of insurance policies dealing with this specific issue, other than the cases that have gone up. With all respect. You see, you keep saying the insurance company is the bad guy. But my question is, maybe you're a little biased. Maybe the insurance company is the guy that's being taken to the cleaner indirectly because he has to cover this uninsurance, UIM and UM, and it's only collected a few times. But see, you haven't given me statistics that say either way on that. Well, if your honor is asking me, have I provided or could I provide statistics for, for example, the state of Illinois, for how many policies, that is auto policies, contain excess uninsured and underinsured motorists, with all respect, I don't know where I would get that data. Because I'm unaware that there would be a central filing system where anybody would be able to obtain that data. No, I'm saying collected on it. In other words, the absolute under 20 or under 50, that's easy accessible. How many claims have been collected on that? With all respect, I need to disagree with you because I can call USAA in 20 minutes, they'll give me that answer. I'm sorry, you could call who, sir? USAA, insurance company. Well, they could only tell you, I'm sure they could tell you what their experience is. Right. Considering there are hundreds of insurance companies authorized to write auto policies in Illinois, I'm not exactly sure how informative that might be if you knew the experience for one particular company. I can't say it would be useless, but I must disagree that it's terribly informative. And I must also respectfully comment upon that the insurance company here is definitely not the victim because although they are compelled to sell the coverage, they are also not a charitable organization and they are entitled to charge a premium for it. Recall, Your Honors, that in this state, so far, we have file and use statutes. That may be a little esoteric. If I'm an insurance company and I want to charge a certain premium, I file the rates and that's what I charge. I don't need anybody's permission to tell me what I can charge, and I don't have to ask, can I please charge this? I file the rates and I charge it. So they are being compensated for it, and like any other risk, no insurance company would underwrite a risk. Forget about a given quarter, a given year. That could happen. But you could be sure they would adjust that premium so that they're intended, and they do make a profit out of it, but they do make a profit out of it by delaying cases for 10 or 12 years, as you can see what happened in here, and I think that a careful examination of why Justice Palandic thought and the two other judges who agreed with him that the whole business was unconstitutional, they have this compulsory arbitration, which we don't have under the underinsured motorist statute, and a specific authorization for a kick-out clause, which we don't have, and I think that based upon what the Illinois Supreme Court has told us in Parker, why Bukalakas was good law when it was announced. It was, of course, written by Justice Thomas, now a member of the Supreme Court, and it continues to be a good law rule of decision, and I can't imagine why you have this grossly disproportionate holding by our sister states as to the invalidity of this clause. I do understand what the dissenting opinion in the first case here, which was Samick said, and I understand what the three judges said in Zappia. They're just wrong. Even very good, respected judges can be wrong, and frankly they ought not to have satisfied your honors as to why it is that their opinion that this is one. The minute they said, frankly, that this is not a contract of adhesion, it makes my head spin, and I do not understand the rationale, and I hope your honors don't either, as to why this is skewed, why it's not skewed in favor dramatically of an insurance company and it operates in an equal hand basis. Your honors, if you have any other questions of me, I'll be glad to sit down if you don't. Or I will sit down. I thought we were going to hear from your sidekick. Your honor, first of all, he's my partner, and he's the one who wrote, which I consider to be a very fine brief, and his name is Oliver. Oh, that's why I thought we were going to hear from him, because we heard from him a week ago. And you're definitely going to hear from him in rebuttal. Oh, okay. Thank you. All right.  Good morning, and may it please the Court. I am Michael Resis, R-E-S-I-S, and along with Jason Zajac, I am here today on behalf of Phoenix Insurance Company. The Travanova Clause, which is the subject of this appeal, was upheld as part of the statutorily mandated uninsured motorist coverage in Reed v. Illinois Farmers. And the briefs have talked around Reed, and we've heard from counsel this morning about Reed, where he recognized that the uninsured motorist coverage and the underinsured motorist coverage are closely related. Those were his words. And we submit that Reed cannot be distinguished simply on the grounds that that case involved uninsured motorist coverage, whereas this case involves underinsured motorist coverage. The two coverages are closely linked, as I think has been raised this morning, in the insurance code. Section 143A2, subparagraph 5, allows insurers to combine the two coverages when their limits are the same. That's whenever you're going to have it above the 20,000, 40,000 minimum limit. And we respectfully submit, in line with ZAPIA, the most recent case from this district, which adopted Justice Hoffman's dissent in SAMHEC, that if the nonbinding uninsured motorist arbitration is not against public policy, then nonbinding underinsured motorist arbitration cannot be against public policy. Well, aren't you asking us to change the statute? Absolutely not. We want you to follow the statutory scheme, which contemplates the possibility that you're going to have the coverages combined and subject to a single arbitration agreement. What they want you to do is reach a result in which the same clause would be valid for uninsured motorist coverage, but invalid for underinsured motorist coverage. And respectfully, we do not believe that that would be a proper result under the law or as a matter of public policy. Binding arbitration of underinsured motorist claims is not unconscionable, it's not arbitrary, it's not irrational, and it's not contrary to the insurance code. The same procedures for underinsured motorist arbitration under the policy are the same as those for uninsured motorist arbitration. Nothing about three-person arbitration that results in a binding award is unconscionable, arbitrary, irrational, or contrary to the insurance code. Counsel may make the point that this controversy has been going on for more than ten years. The legislature is not seeing fit to add the same language in the underinsured that it is in the uninsured. It has allowed the parties the freedom of contract to structure their agreements to provide for binding or nonbinding arbitration as they see fit for underinsured motorist coverage. And of course, for uninsured motorist coverage, the legislature actually favors binding arbitration. My point is, if it was the intent of the legislature for that provision to apply to underinsured, why didn't it do so in the last ten years? Well, first of all, underinsured motorist coverage is not statutorily mandated. So they couldn't write into the law and have it apply to a coverage that you can't even buy if you buy the minimum limits of bodily injury liability and uninsured motorist. If you buy a 2040 policy, you're not going to get underinsured motorist coverage. The point I'm trying to make is that once you buy the underinsured motorist coverage because you bought a policy that's above 2040, then the insurance code allows it to be wide open. It allows you to have the coverages combined if the insurance company writes it that way. And it allows the two coverages, if they're combined, to be subject to a single arbitration agreement and the insurance code has already been drafted to require binding arbitration of certain claims. And the last point I want to make with regard to the whole question of legislation is, and I'm indebted to counsel for reminding me that there was an amendment made effective January 1, 2004, which raises the threshold for rejection from $20,000 for uninsured motorist to $50,000 uninsured motorist. Now, realize that doesn't apply to our case. But we can draw the conclusion that the legislature likes binding arbitration. It has expanded the number of claims to which binding arbitration applies. Now, again, that amendment is after this accident and it's not directly relevant. But to the extent counsel wants to refer to it, all it proves is that binding arbitration is the public policy of Illinois. Now, other arguments that the defendant has raised do not support the extraordinary step of invalidating the clause. The Supreme Court has not signaled its agreement with cases invalidating the clause in Reed. Reed did not disagree with Bugalikas. We can certainly agree on the pronunciation of Bugalikas from the Second District. But neither did it agree with the Second District on Bugalikas. It avoided any dicta about agreeing or disagreeing. That is, it did not express an opinion on an issue involving the clause in the underinsured motorist context when that issue was not before the court. And it was not essential to the Supreme Court's disposition of the statute containing the trial de novo clause. The denial of leave to appeal in Parker, to which counsel refers, doesn't mean anything. It doesn't prove anything. The Supreme Court also denied leave to appeal in Mahon, which is the first case to consider this clause 20 years ago. Although most of these cases have come down in the last 10 years. The first case that came down on this issue was Mahon from the First District. The Supreme Court denied leave to appeal in that case too. So the denial of leave to appeal is not precedential. It does not confer any approval on the appellate decision. And if you go by that basis, Mahon would be the answer to any argument counsel has about the Supreme Court letting the decision stand in Parker. They let the same decision stand in Mahon.  Well, let's be clear. In Mahon, the court said that the clause was upheld against an argument that it was contrary to public policy. Now, later courts did distinguish Mahon on the basis that the notion that the provision was unconscionable was not specifically raised or addressed in Mahon. But if you look at Mahon at page 217 of that decision, it does address and holds that the clause is not contrary to Illinois public policy. So I think Mahon is a valid decision here. But we realize it's only one of a number of decisions on either side of the question. Maybe the best way to describe the law in the area and realize we're facing, we think that Reed is probably the best decision out there since it's from the Supreme Court, admittedly though on a different coverage, is Costello, which I think may be one of the most recent decisions, which without addressing the clause specifically described the law as unsubtle. And in light of the fact that we do have decisions from the first, the second, the third, and the fifth, I think we would have to agree that the law is somewhat unsettled, although we think that the result and the logic of Reed supports upholding the trial de novo clause here. The issue here is not, as counsel says, whether the policy is a contract of adhesion. Some courts think that an insurance policy is not a contract of adhesion, and we've cited Atkinson, one of them. Some policy terms may be adhesive because by act of legislation the policy must contain those terms. One of the best examples is the trial de novo clause in the uninsured motorist arbitration. Every policy that has uninsured motorist coverage in the state of Illinois has to have that clause. Okay, does that make that term adhesive? I guess. Does that mean it's invalid? Obviously not. The issue isn't whether or not it's adhesive. The issue is whether it is so one-sided as to be unconscionable. And our position is, if I can summarize it, if the clause is good in the uninsured motorist coverage, it can't be bad in the underinsured motorist coverage. Counsel says that there's something, I guess, unconscionable if Phoenix rejects the arbitration award of $382,500 here. But if the defendant had been dissatisfied with the award, the defendant had the same right to reject that we exercised in this case. On its face, the clause gives the parties an equal right to reject if one or the other is disappointed with an award that's above $20,000. I think Justice Fitzgerald Smith made the interesting observation that we really don't have empirical data that would tell us with what degree of frequency one side or the other side is rejecting awards above $20,000. We would submit that the assumption of some of the appellate courts, and Bogolakis and Parker, merely assume that it's going to be the insurer that automatically rejects an award above $20,000 and demand trial de novo. But as Zappia and Coast from the 5th District demonstrate, insurers also reject awards that are above $20,000 if those awards are less than what is the compensation to which they believe they're entitled. Why do they need limits anyway? Why not let each party, regardless of the amount of the arbitration award, just appeal if they're unsatisfied? Well, the binding arbitration, the lower end for the moment, if we're talking about the lower end, well, that's obviously for the uninsured motorist arbitration, that's written into the law. And the underinsured motorist arbitration simply tracks that and is read. I mean, why not put a limit on it? If it's fair, it's fair. If parties are dissatisfied with arbitration, let the parties go to trial for trial de novo. Why put a lower limit on it? Well, the lower limit, as the Supreme Court instructed in Reed, is there because, first of all, having the binding arbitration for the minimum limit, the $20,000 minimum limit, promotes the prompt resolution of claims because you go through arbitration instead of clogging up the courts with these lawsuits. And secondly, it reduces litigation costs because arbitration is going to be cheaper than taking the case to trial. That's one of the values of arbitration. But that's the point. Why put a limit on it? Why not put all of them into arbitration? Well, they all start out in arbitration. But why do you want to keep some people out? You mean, why do we want to give each side the right to reject above a certain limit? Why put any limit at all on the right of a party who's dissatisfied with the arbitration to come to court? Well, I think that, again, Reed tells us that there are other competing public policies. And those policies are to reduce the cost. And when we're talking about $20,000, we're talking about a very low limit as far as what is going to be binding. Above that limit. And I think I can say confidently that many, many, most, this overwhelming majority of arbitrations will have awards that are above $20,000. Either side is free to reject. And you don't have... If that's the case, why put the, again, if that's the case, why even put the $20,000 limit on it? Most award to over $20,000 and both sides can reject. Why even have the $20,000? Well, as I said, the legislature likes to make it binding for uninsured motorist arbitration, right?  And remember, the legislature is in the best position to decide public policy as Reed instructs. And it said this statute, which contained the clause, is reasonably related to the desirable public policy goals of reducing costs and promoting prompt resolution of claims. Well, how is that goal obtained in the case that we have in front of us? We have an accident that happened in 2001. Right. We got an arbitration award in 2008. And now you want to start all over again with discovery and all the rest. You know what? It's the same thing, you know? And in most cases, I like what you're saying. And you know what? They're over the $20,000. How does that serve our policy? And if... Because it does have the policy of freedom of contract. If opposing counsel wasn't happy with the $382,500, the coverage limits were a half million dollars. All right? Maybe he thinks the case is worth a half million dollars. Maybe we are the ones in a different situation where we would be happy to pay the $382,500, and he's not happy with the $382,500. He gets to reject. Right? He gets to reject. He has the same right that we would have as far as the right to reject. The point is that whether or not there's going to be rejection in any case is going to be... going to depend on the particular case and the expectation of the parties in terms of what the damages are. If we think a case is one of no liability, but there's an award, we might think that's too high, we want to reject. If they get an award, but they think there was too much comparative fault to reduce the net award, or maybe after all the set-offs are calculated, they're not happy with the net award, they get the right to reject. There are different public... I guess, Justice House, the best way to answer the question is to say that in any instance, we're going to have competing public policies. One policy is we want to reduce litigation costs. Another policy is we want to promote resolution. A third policy, though, is freedom of contract. That is a public policy in the state of Illinois, and the rule of construction is to favor contract provisions. Let me suggest a freedom of contract provision. You know, counsel just suggested if you or I want to get this underinsured coverage, we tell our insurance man that's what we want, and we get a package in the mail, this is it. The only thing we ask about is how much the dollar amount of coverage we get, and all the provisions are set out by the writer of the policy, which is the insurance company. The same as it would be if we had a notice provision or if we had a other provision dealing with a condition precedent to the policy. I'm not disputing that there are terms that are not negotiable in an insurance policy, but that doesn't mean they're bad. That simply means you have to ask whether it's all one-sided. So the freedom of contract is either you get underinsured or you don't, and that's the choice? That's the first choice. And the second choice is how much money? How much coverage? And that's basically it. After that, you know, I'm not in a position to say what other insurance companies will write. I can tell you that the insurance code does contemplate the possibility, again, that you're going to have the coverages combined into one and subject to one arbitration agreement, and it's already got the de novo clause already has to be there for the uninsured motorist coverage. And our position, again, is simply if the clause is valid in the uninsured motorist coverage, it would be anomalous to say it's against public policy in the underinsured motorist coverage. Well, the legislature has made that distinction. The legislature didn't seem fit to put that language in the underinsured motorist coverage provisions, and you're asking us to read it into it. It's interesting, in the law book yesterday, I don't know if you read it, there was a very long article by Stephen Garmisa relating to Schultz v. Illinois Farmers Insurance. And in that case, as reported, it came out in March of this year, farmers claimed it was entitled to use a restrictive definition of insured for purposes of uninsured motorist claims. Yes. What Justice Carmier said in that case is this. We must interpret and apply statutes in the manner in which they are written. We cannot rewrite them to make them consistent with our own idea of orderliness and public policy. And went on to point out that the legislature had clearly not made the distinction between uninsured and underinsured motorists as far as that coverage was relating to permissive drivers. It was a different issue, but the thought is the same. It's exactly the same. And you're asking us to read something into underinsured that the legislature has seen fit to put in with regard to the uninsured, and I don't know that that's our office to do that. I'm not asking you to imply or read anything into the insurance code. All I'm saying is that we know the clause is valid in the one coverage, and we know that the two coverages can be combined and subject to one agreement. And all I'm saying is that if it's valid as to the one, it can't be invalid as to the other. But I'm not asking you to rewrite the insurance code. I'm not asking you to read anything in addition to the insurance code. This coverage is not even mandated by the insurance code. All I am asking for is consistency in result. If it's valid as to the one, it should be valid as to the other. That's all that Zappia is saying when it adopted Justice Hoffman's and Justice Oldridge's defense. Well, didn't the Supreme Court in Reed uphold the uninsured motorist provision on grounds of public policy? Yes. Okay. And as Justice Wolfson pointed out in his concurrence in Samick, he found that the court had taken pains to leave the bugalistics holding intact when it rested its decision on the section of the code that did just that. And so the legislature has specified what its belief of public policy is with regard to uninsured. They have not done that with underinsured. And you're asking us to do that. No, Justice Truman, respectfully, I'm asking you to read Reed as it was written. It neither agrees nor disagrees with bugalicus, the second district case, because that issue was not before the Supreme Court. Wait a minute. With Parker, they sent Parker back on a supervisory order. Correct. And asked the court to take another look at it. The court did, came up with the same result. That's right. That could have gone back up again. The Supreme Court left that holding intact, which is consistent with bugalicus. And I would say, though, that the denial of leave to appeal is understood not to be precedential, doesn't confer approval. They didn't take Mahon either. Now, I appreciate what you're saying from Justice Wilson's special concurrence, but obviously the law didn't stop with Samick. We do have Zappia, where the appellate court, the fourth division of the first district, adopted Justice Hoffman's dissent in Samick and Justice Holdridge's dissent in Parker. I mean, there's no lack of judicial decisions on this clause, and we have disagreements not only among appellate panels, but within appellate panels. And that is why I am suggesting that for the sake of consistency in the result, when the clause is valid in the one coverage, it should be construed as valid in the other coverage. I know that my time is probably run out by now, but we are appreciative and grateful for the opportunity to address the Court, because we know that oral argument is a matter of privilege and not a right. And for all the reasons set forth in our brief and oral argument this morning, we ask you to affirm the trial court and follow this Court's decision in Zappia. Thank you. Thank you. Your Honors, briefly in rebuttal, and I will try to be very brief, because I think both sides of the issue have been argued. I think the questions are clear, and I want to avoid repetition, but I do want to emphasize a few points which I think are key and which need to be emphasized. I think I heard the phrase freedom of contract no less than three or four or five times from counsel, arguing that affirmance is necessary to promote freedom of contract. And I think it's clear. I think everybody in this room knows that there really isn't any freedom of contract. That is an empty platitude. The only freedom of contract is the insurance company's freedom to tell the insured, this is what your contract says. You can tell us how much coverage you want, and you can tell us if you want coverage at all. But that's it. Nothing else. There isn't any multiple choice in the policy that says, would you like arbitration or do you not want arbitration? And if you do pick arbitration, there's no multiple choice. Would you like to have it binding on both parties if it's 20,000 or below or 50,000 or below or 200,000 or above? There isn't any choice. This is it. Take it or leave it. And that's why there is no freedom of choice. That's why it's a contract ofhesion. And counsel is correct in telling you that just because there is no freedom of choice doesn't necessarily invalidate a policy. But when you couple no freedom of choice, zero freedom of choice with a contract that is very one-sided and stacked totally in favor of one party as opposed to the other and which is oppressive, then you have unconscionability. Then you have contrary to public policy. And that's why the various appellate courts, and I guess I'll pronounce the name, I'll mispronounce it for how many times, Hoogalaskis, and that's why the majority in Samick, and that's why the appellate court in Cost, and that's why the appellate court twice in Parker said that this provision is contrary to public policy. Counsel also argues, and this is the mantra, you have to have consistency. You have to have consistency between uninsured motorists and underinsured motorists. It has to be consistent. Well, the legislature decides whether it has to be consistent or not. And the legislature decided to put a requirement for this type of clause only in uninsured motorist policies. That was their choice. They chose not to be consistent. And it's not for the courts to make it consistent just so insurance companies can be happy all the way around. And I think anyone who reads Reed, the Supreme Court decision, can tell that the Supreme Court was not happy with that provision. They didn't think it was a good provision. They didn't think it was a fair provision. The majority, I think it's obvious, didn't think it was a fair provision. But they said, look, our hands are tied behind our back. The legislature decides what's public policy. And even if we don't like it, we're stuck with it because that's the branch of government that tells us what is public policy. But they went to great pains, as our appellate courts have pointed out, great pains to say, what we're saying here doesn't apply to the UIM coverage. Don't take this case and assume that we would say the same thing in those other contexts. They say that. And how do we know that they say that? Because they say, in distinguishing, notably, the statute concerning underinsured motorist coverage at issue in Bougalaskas does not require a similar arbitration provision. That's how they distinguish those other cases, notably. And they went on to say, we believe that this distinction is dispositive of this issue. How much clearer could the Supreme Court be when it says that the distinction is dispositive of the issue, that the legislature says you have to have it here, but they didn't say you have to have it there. They say that's the beginning and the end of the discussion. Parker figured that out when the Supreme Court sent the case back and said, hey, rethink this. Think about it again. In light of Reed, just make sure you look at Reed before you finally, finally decide it. They looked at Reed, and they said, they distinguished Reed the same way I just distinguished Reed. And the Supreme Court, when it came back up to them, said, they didn't say it, but they said it. We don't have to touch this. It's okay. That's how you apply Reed. Your Honors, I think the problem here is clear. I think the answer is clear. I think we have a provision that is stacked totally in favor of the insurance company. The fact that insureds can win under this provision and the fact that there are awards that an insured might also want to reject does not mean that the deck isn't heavily stacked in favor of the insurance company. The clause is written so that the insured is stuck with its worst-case scenario, and the insurance company gets away with its worst-case scenario. That is unfair. And for those reasons, we ask this Court to follow the well-reasoned decisions in Bugulaskis, Parker, Cost, Samek, and reverse the decision of the trial court in this case. Thank you, and I'll defer no further questions. Thank you. The matter will be taken under advisement.